(873 P.2d 219)
No. 69,588

MACKE LAUNDRY SERVICE LIMITED PARTNERSHIP, *Appellee*, v. MISSION ASSOCIATES, LTD., d/b/a HERITAGE HILLS APARTMENTS, and JETZ SERVICE COMPANY, INC., *Appellants*.
Petition for review denied 255 Kan. 1002 (1994).

Opinion filed May 6, 1994.

*Emily Jane Bailey*, of Watson, Ess, Marshall & Enggas, of Kansas City, Missouri, and *Gerald L. Goodell*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, for appellants.

*Stephen G. Mirakian*, of Wyrsch, Atwell, Mirakian, Lee & Hobbs, P.C., of Kansas City, Missouri, for appellee.

Before LEWIS, P.J., GREEN, J., and JAMES J. SMITH, District Judge, assigned.

GREEN, J.: This appeal involves a tortious interference with a contractual expectancy claim brought by Macke Laundry Service Limited Partnership (Macke). Macke contends Jetz Service Company, Inc., (Jetz) tortiously interfered with its contractual expectancy with Mission Associates, Ltd., d/b/a Heritage Hills Apartments (Heritage Hills). Originally, Macke's action included a claim against Heritage Hills for breach of contract; however, this claim was stayed as a result of Heritage Hills' bankruptcy. The jury found in favor of Macke, and the trial court entered judgment accordingly. Jetz appeals, arguing the trial court erred in granting Macke's partial summary judgment motion, in denying its motion for directed verdict on Macke's tortious interference claim, in certain of its evidentiary rulings, and in awarding Macke punitive damages. Our resolution on Jetz' first claimed error makes a detailed recitation of the facts unnecessary. Accordingly, we will only recite the facts necessary to present our decision.

On October 19, 1982, Heritage Hills entered into an agreement with Laundry Equipment Services, Inc., for use of laundry space and equipment at the apartment complex. Sometime before the events causing this action, Macke acquired the rights to this agreement by purchasing Laundry Equipment Services, Inc.

The agreement provided for a minimum term of five years and automatic annual renewal thereafter without notice. The agreement also provided that either party could terminate the agreement "at the expiration of the minimum period . . . or at the end of any subsequent twelve-month period, by giving written notice thereof by mail to the other party at least 60 days prior to the expiration of said minimum period, or at least 60 days prior to the end of said subsequent twelve-month period."

It is undisputed that on August 20, 1990, exactly 60 days prior to end of the 12-month period ending October 19, 1990, Heritage Hills sent, by certified mail, a written notice of termination to Macke. The return receipt showed Macke received the notice on August 21, 1990, or 59 days prior to the end of the 12-month

period. Macke then notified Heritage Hills that since notice was untimely given, it expected the agreement to be honored until October 19, 1991. On November 18, 1990, despite Macke's claim that the agreement automatically renewed, Heritage Hills removed Macke's laundry room equipment from its apartment complex. Macke then brought the present action against Heritage Hills for breach of contract and against Jetz for tortious interference with a contract or business expectancy.

Heritage Hills, Jetz, and Macke all filed motions for summary judgment on the issue of whether Heritage Hills had properly terminated the agreement because it had not given timely notice of termination. On May 17, 1991, the trial court granted Macke's motion for summary judgment, finding Heritage Hills failed to give timely notice and the agreement had not terminated on October 19, 1990. Therefore, Heritage Hills breached the agreement by refusing to honor its terms after October 19, 1990.

Jetz first argues the trial court erred in determining Heritage Hills breached its agreement with Macke by failing to give written notice within 60 days of October 19, 1990. Jetz contends the plain language of the contract establishes notice was timely given.

"Where the facts are not disputed, summary judgment is appropriate. . . . [I]f the only questions presented are questions of law, the summary judgment is proper. [Citation omitted.]" *Finstad v. Washburn University*, 252 Kan. 465, 468, 845 P.2d 685 (1993).

"The construction of a written instrument is a question of law, and the instrument may be construed and its legal effect determined by the court on appeal. [Citation omitted.]" *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 455, 827 P.2d 24 (1992). Further, "regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. See *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, Syl. ¶ 1, 754 P.2d 803 (1988)." *State v. Smith*, 244 Kan. 283, 284, 767 P.2d 1302 (1989).

Here, the parties agree no material facts are in dispute. The only issue presented was whether the termination of the agreement provision was complied with when the written notice was

mailed by Heritage Hills or when received by Macke. Accordingly, the issue presented was appropriate for summary judgment.

In interpreting an agreement, if the language "is clear and can be carried out as written, there is no room for rules of construction." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 680, 829 P.2d 884 (1992). "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." 250 Kan. at 680.

Both parties argue the contract is unambiguous but place differing interpretations upon the termination provision. Macke contends the language "giving written notice thereof by mail to the other party" requires notice of termination be received before it is effective. Jetz, on the other hand, contends the language makes notice effective upon mailing.

After examining the agreement, we conclude it is clear and unambiguous. Our analysis has been guided by several rules of contract construction.

"First, words cannot be written into the agreement imparting an intent wholly unexpressed when it was executed. *Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978). The intent of the parties and the meaning of a contract are to be determined from the plain, general, and common meaning of terms used. *Johnson v. Johnson*, 7 Kan. App. 2d 538, 542, 645 P.2d 911, *rev. denied* 231 Kan. 800 (1982). Second, in construing a written instrument, language used anywhere in the instrument should be considered and construed in harmony with all provisions and not in isolation. *Kennedy v. Classic Designs, Inc.*, 239 Kan. 540, 722 P.2d 504 (1986). Further, doubtful language in a contract is construed most strongly against the party preparing the instrument or employing the words concerning which doubt arises. *First National Bank of Lawrence v. Methodist Home for the Aged*, 181 Kan. 100, 104, 309 P.2d 389 (1957)." *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 586, 738 P.2d 866 (1987).

The trial court found that the Heritage Hills-Macke agreement was a private service contract, not a lease, and therefore "not subject to compliance with statutory notice requirements for termination of leases." Relying on *Mosher v. Kansas Coop. Wheat Mkt. Ass'n.*, 136 Kan. 269, 276, 15 P.2d 421 (1932), the trial court then concluded that Macke was entitled to at least 60 days actual notice of the termination, measured from the date the notice was received.

Macke contends *Mosher* requires the termination provision to be construed against the party terminating the agreement.

In *Mosher*, the Supreme Court reversed the trial court's determination that a grain delivery contract was void for indefiniteness and held the elevator operator had breached the contract. The contract provided both parties an option of early termination by giving notice of their intentions to do so prior to the first day of April. The grain elevator operator argued its April 17, 1926, notice was sufficient to cancel the contract. In rejecting this argument, the court stated:

"The parties had a right to agree on a means of terminating the contract, and such provision is binding and will be enforced as any other part of the contract. The option to terminate a contract is in the nature of a forfeiture, and it will be strictly construed. The notice to terminate, to be effective, must be given at the stipulated time. [Citation omitted.] The notice was too late and did not terminate the contract." 136 Kan. at 276.

Macke incorrectly assumes *Mosher* requires a strict construction of the termination provision against Heritage Hills. Rather, *Mosher* only requires a termination provision be strictly complied with to be effective. See *Stromquist v. Nelson*, 159 Kan. 716, 722, 158 P.2d 458 (1945).

Macke also cites *Shields v. State Highway Commission*, 178 Kan. 342, 286 P.2d 173 (1955), to support its claim that Heritage Hills' notice to Macke was untimely. *Shields*, also, is distinguishable from the Heritage Hills situation. In *Shields*, the plaintiff sued the State Highway Commission to recover damages allegedly resulting from a defect in a state highway. A statute required a person that had sustained damages because of a defect in a state highway to serve a written notice of the claim upon the director of highways either in person or by registered mail. The statute also required the written notice to be served on the director of highways within 90 days after damage is sustained. Nevertheless, the termination provision herein did not require the written notice to be *served* on a particular individual as was required in *Shields*. Moreover, the statute permitted written notice either in person or by registered mail. Here, the termination provision required the written notice to be given by mail only.

In addition to *Mosher* and *Shields*, Macke cites several other cases that specify written notice by mail must be received to be

effective. See *State ex rel. Hall v. Camper*, 347 A.2d 137, 138-39 (Del. Super. 1975); *Oldsfield v. Chevrolet Motor Co.*, 199 N.W. 161, 162 (Iowa 1924); *Johnson Manufacturing Co. v. Edwards*, 344 S.W.2d 506, 510-11 (Tex. Civ. App. 1961). These cases, however, are distinguishable.

In *Oldsfield*, the agreement required the giving of written notice but, unlike this case, was silent on the manner of the giving of the notice.

As to *Johnson*, the agreement required written notice of an infringement and the tender of $1,000. The Texas Court of Civil Appeals stated:

"If the actual receipt of the money was not within the contemplation of the parties it would have the effect of declaring the very fundamental part of the contract to be void; that is, the bringing of suits by appellees to prevent infringing devices. They could not bring the suit without the knowledge of the infringing device and they were not under any obligation to bring it without the thousand dollars with which to prosecute it." 344 S.W.2d at 511.

Unlike *Johnson*, the written notice of termination herein did not involve a tender or a continuing obligation to perform under the contract.

Finally, *Camper* is distinguishable because the plaintiff in that case never received the first written notice of termination. Here, Macke received the written notice of termination.

To support its position that the notice was effective upon mailing, Jetz cites two cases which it believes are on point.

First, in *Music, Inc. v. Henry B. Klein Co.*, 213 Pa. Super. 182, 186, 245 A.2d 650 (1968), the court held "notice of cancellation received on the first business day after that literally required by the contract was adequate to effect a termination of the contract." The agreement at issue required written notice of cancellation be given at least 60 days prior to the end of the term; otherwise, the agreement automatically renewed for another term of three years and eight months. Klein mailed notice on a Friday, the 61st day, but it was not received until the following Monday (58th day). Since the notice provision was silent on a means of delivery, the notice should have been effective only when received. However, the court held notice was effective on equitable grounds. The facts established "that the terminating

party acted reasonably under the circumstances and there is no demonstrable prejudice resulting from the delayed notice." 213 Pa. Super. at 185. See *Fleming Companies, Inc. v. Equitable Life Ins. Co.*, 16 Kan. App. 2d 77, Syl. ¶ 4, 848 P.2d 813 (1991). (equitable principles used to avoid strict compliance with a lease renewal notice).

*Music*, however, is distinguishable from our case because neither party argued whether the notice should be considered effective under equitable grounds at the trial court level.

Second, Jetz contends *Restaurant Associates, Etc. v. Anheuser-Busch, Inc.*, 422 F. Supp. 1105 (S.D.N.Y. 1976), *aff'd in part and rev'd in part on other grounds*, 559 F.2d 1205 (2d Cir. 1977) (unpublished opinion), is directly on point with the issue presented here. In *Restaurant Associates*, the plaintiff argued Anheuser-Busch had breached its contract for operation of the food and beverage facilities at Busch Gardens in Tampa, Florida. 422 F. Supp. 1106-07. The agreement provided automatic annual renewal unless either party gave written notice of termination to be sent by certified or registered mail at least 90 days prior to expiration of the term. Anheuser-Busch mailed, by regular mail, notice of termination 91 days before expiration, but the plaintiff did not actually receive notice until 88 days prior to the expiration. The plaintiff failed to object to the untimely notice until it brought suit after efforts to negotiate a new agreement failed. In holding that the notice was sufficient to terminate the contract, the trial court stated:

"Associates claims further that the September 24, 1973 letter was ineffective to terminate the Management Agreement because although it was mailed 91 days before the December 25, 1973 expiration date, it was not received until 88 days before that date. The Agreement, however, provided not that notice should be received but that notice should be given not less than 90 days prior to the expiration date. There is no indication that the parties intended time of receipt to be of the essence. To the contrary, . . . letters sent via registered or certified mail should be deemed effective as of the date of the mailing thereof. It would be unrealistic to view the 1973 letter to have been too late when no such thought crossed the mind of Associates until this litigation and no prejudice resulted from the alleged delay. [Citation omitted.]" 422 F. Supp. at 1108-09.

*Restaurant Associates* appears to be very similar to this case.

The narrow issue presented here is one of first impression in Kansas. We believe the better rule regarding the mailing of a notice is best summarized as follows:

"Where a statute or rule merely states that written notice shall be given, ordinarily mailing a notice is not alone sufficient; the notice must be received. (Citation omitted.) When, however, a statute or rule does not merely state that written notice shall be given but also states that it may be given by mail, service is ordinarily accomplished by depositing the notice in the mail properly addressed and stamped." *Liberty Mut. Ins. v. Caterpillar Tractor Co.*, 353 N.W.2d 854, 857 (Iowa 1984).

See *Mund v. Rambough*, 432 N.W.2d 50, 53 (N.D. 1988); *Johnson Service Co. v. Climate Control Contr., Inc.*, 478 S.W.2d 643 (Tex. Civ. App. 1972).

We conclude that written notice of termination shall be effective upon mailing when the contract expressly requires the notice to be given by mail and when the notice provision is silent as to receipt. Furthermore, to be effective, the notice must be correctly addressed, stamped, and mailed within the specified period of time required by the contract for giving timely notice, and the addressee or the addressee's employee or agent must receive that notice within a reasonable time after its mailing.

Additionally, if the notice of termination is not received within a reasonable time after its mailing, the notification shall be ineffective. Nevertheless, a presumption will occur that notice was received by the party to whom it was addressed if that notice is correctly addressed, stamped, and mailed. This presumption, however, is rebuttable and may be overcome by evidence that notice was never received. *Camper*, 347 A.2d at 139.

Applying the above rule to this case, we conclude Heritage Hills gave timely written notice to Macke by depositing its notice in the mail on August 20, 1990, and by Macke's receipt of such notice on August 21, 1990. Because notice was timely given and the contract terminated on October 19, 1990, the trial court erred in granting summary judgment to Macke.

Having decided Heritage Hills did not breach its contract with Macke, we must now determine if Macke's claim for tortious interference against Jetz is still sustainable.

In its amended petition, Macke alleged Jetz intentionally, wrongfully, and maliciously interfered with Macke's rights and

entitlements under its agreements with Heritage Hills and with its economic expectancies under the agreement. These claims were premised on Jetz' conduct regarding the removal by Heritage Hills of Macke's laundry room equipment in November 1990 in violation of the agreement.

A claim for tortious interference with a contractual relationship requires the existence of a valid and enforceable contract at the time of the interference between the plaintiff and a third party. Prosser & Keeton, Law of Torts § 129, p. 994 (5th ed. 1984). See *Noller v. General Motors Corp.*, 244 Kan. 612, 619, 772 P.2d 271 (1989). Here, we have found the agreement ended on October 19, 1990, and Jetz' conduct in November 1990 did not interfere with an existing contractual relationship. Thus, Macke's claim of tortious interference with a contract must fail.

Macke also alleged a tortious interference with its future economic expectancies from the contract. We believe this claim is in essence a claim for tortious interference with a prospective business advantage. To maintain a cause of action for tortious interference with a prospective business advantage, the plaintiff must establish:

"(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986).

Macke argues its claim of tortious interference with its economic expectancies is not dependent on a breach of the agreement. Rather, Macke claims all it needed to prove was that Jetz' malicious interference diminished its future economic expectancy from its relationship with Heritage Hills.

However, an essential element of Macke's claim required it to show it was reasonably certain it would realize a future economic benefit. Here, Macke was aware that Heritage Hills was dissatisfied with its service and was soliciting bids from other laundry services even before Heritage Hills mailed its notice of termination to Macke on August 20, 1990. Clearly, Macke had no real

expectation for future economic benefit with Heritage Hills. Moreover, because we earlier determined the contract between Macke and Heritage Hills terminated in October 1990, it would have been impossible for Macke to realize any future benefits from its relationship with Heritage Hills, a fact Macke's counsel acknowledged at oral argument. Therefore, Macke's claim for tortious interference with its economic expectancies must also fail.

Because we are reversing the judgments against Jetz for actual and punitive damages, we find it unnecessary to address the other claimed trial errors raised by Jetz.

Reversed.